[Cite as *State v. Williams*, 2022-Ohio-2245.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Earle E. Wise, Jr., P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2021CA00081 |
| | : | |
| MICHAEL WILLIAMS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING: Appeal from the Stark County Court of
Common Pleas, Case No. 2020CR0398


JUDGMENT: AFFIRMED


DATE OF JUDGMENT ENTRY: June 29, 2022


APPEARANCES:

For Plaintiff-Appellee:

KYLE L. STONE
STARK CO. PROSECUTOR
TIMOTHY E. YAHNER
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

For Defendant-Appellant:

KRISTIN L. ZALENSKI
122 Central Plaza North
Suite 101
Canton, OH 44702

*Delaney, J.*

{¶1} Appellant Michael Williams appeals from the June 29, 2021 judgment entry of conviction of the Stark County Court of Common Pleas, incorporating the trial court's Judgment Entry of October 27, 2020 finding the minor child victim competent to testify. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶1} This case arose in September 2019 when Jane Doe, age 6 at the time, disclosed to an uncle that her stepfather sexually abused her.[1] The following evidence is adduced from the record of appellant's jury trial, video depositions, and an evidentiary and competency hearing pursuant to *State v. Arnold,* 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775. Where pertinent, the source of the evidence is cited.

*Testimony of Doe's uncle: initial disclosure*

{¶2} T.J. is the uncle of victim Jane Doe.[2] In September 2019, T.J. had a birthday party for his daughter at his home in Akron and Doe attended. T.J. testified that he was on his front porch, talking to another adult about appellant, and Doe overheard the conversation. Doe came over to T.J., sat down beside him on the step, hugged and kissed him, and whispered to him that she wanted to tell him a secret. T.J. then testified as follows:

> She told me that her daddy used to make her do things to her
>
> (*sic* in original). And—I had trouble hearing her at first so I asked her

---

[1] Appellant is sometimes referred to by Doe and other witnesses as her "father," but he was her stepfather at the time of the alleged abuse.
[2] T.J.'s testimony was taken via video deposition in October 2020 because he was awaiting deployment to Texas as a member of the Army National Guard.

to repeat what she said.  She said that her daddy used to make him—make her touch him, and I asked her what do you mean, and he said—she said that he would put a black cap over her head and insert his penis into her mouth.

Video deposition of T.J., 11.

{¶3} After the initial disclosure, T.J. reacted with shock and asked Doe to repeat what she said. When the disclosure was made, Doe's Mother was at a store a short distance away with T.J.'s wife. T.J. called Mother, told her to come home immediately, and advised her of the disclosure. Upon Mother's return, T.J. testified she was crying hysterically, with her head on the dashboard of the vehicle. The family attempted to report Doe's disclosure to Akron police, but was referred to Canton because the offense occurred there.

{¶4} Upon cross examination, T.J. testified he sees Doe four or five times per year, during family holidays, together with the rest of the family. When queried why Doe would choose to disclose to him, T.J. speculated that she is comfortable with him.  When asked whether his immediate response to Doe's disclosure was "You're lying," T.J. agreed that it may have been, but the reaction indicated his shock at the statement, not his disbelief.

*Investigation by the Stark County Sheriff's Department*

{¶5} The reported offense occurred while Mother was married to appellant and appellant was Doe's stepfather.  The family lived on 30th Street in Canton, Ohio, in Plain Township, Stark County, and within the jurisdiction of the Stark County Sheriff's Department.  Deputy John Von Spiegel, the detective in charge of child sex abuse

investigations, was advised of the reported sexual assault. Spiegel's contact with the family occurred through the Stark County Children's Network. Doe was referred for an appointment which will be described infra. Von Spiegel conducted a taped interview of appellant in which appellant denied all sex abuse allegations. Von Spiegel testified he did not collect evidence because Mother and appellant had broken up 10 to 11 months prior to the disclosure and were no longer living together. Nor did any parties live at the 30th Street address. Von Spiegel did not personally interview Doe because all investigative parties use a forensic interview at the Children's Network which will be described infra.  Von Spiegel could not recall whether he spoke to Mother in person or by telephone, but recalled viewing Doe's taped forensic interview after it took place.

*Evaluation of Doe at the Stark County Children's Network*

{¶6} Doe's appointment at the Stark County Children's Network occurred on September 16, 2019.  Evidence arising during this appointment was admitted through the testimony of Certified Nurse Practitioner Alissa Edgein, who testified at the *Arnold*/competency hearing and at trial via video deposition.

{¶7} Edgein is employed by the Akron Children's Hospital Child Abuse Unit and works from the office of the Stark County Children's Network in Canton. Edgein was accepted by the trial court as an expert in the area of medical diagnosis of child sexual abuse.

{¶8} Edgein testified the Stark County Children's Network exists to comprehensively address allegations of child sexual abuse. Children are referred to the network from a number of sources not limited to Children's Services, pediatricians, emergency room admissions, and law enforcement.  When a referral is made, a protocol

is followed with a team approach. The team includes an assigned caseworker from Children's Services; a medical professional such as Edgein; a dedicated neutral forensic interviewer; the investigating law enforcement officer; a victim advocate; and a peer navigator who assists the victim's family with community resources.

{¶9} According to protocol, the child is scheduled for an appointment at the Network. The team meets to discuss potential issues in the case. On the day of the appointment, the parent or guardian is first interviewed to obtain a history of the child and the allegations. Then a dedicated forensic interviewer speaks to the child alone; the interview is videotaped and watched by the team live on closed-circuit television. Then the medical professional asks the patient any follow-up questions for the medical history. Next, the nurse performs a medical exam, then meets with the parent or guardian to discuss follow-up and recommendations for treatment. Finally, the patient is discharged.

*Forensic interview*

{¶10} Edgein and Von Spiegel both testified to the protocol for the forensic interview at the Stark County Children's Network, which is designed to limit how many times a child must repeat the history of the alleged abuse. The forensic interviewer is a trained, neutral party, not associated with law enforcement, who questions the child on behalf of the entire team. Members of the team can watch the interview live via closed-circuit television, or watch the videotaped interview afterward. Before the interview concludes, the interviewer briefly leaves the room to ask team members whether they have any additional questions to present to the child.

{¶11} In the instant case, Edgein observed the forensic interview of Doe via closed circuit television. She used certain portions of the forensic interview in making a diagnosis after Doe's evaluation.

{¶12} A transcript of the forensic interview was reviewed at the *Arnold*/competency hearing. Portions of the forensic interview were played at trial during Edgein's testimony. On October 27, 2020, the trial court issued a Judgment Entry determining which portions of the transcript of the forensic interview are non-testimonial and which are testimonial. The non-testimonial portions were deemed to be for purposes of medical diagnosis and treatment, and therefore admissible at trial.

{¶13} The following pertinent portion of the transcript of the forensic interview contains the portions deemed admissible by the trial court (including those later redacted), and the portions deemed inadmissible but challenged in this appeal, which are italicized.

Transcription of Video Interview of [Jane Doe]

Location:  Stark County Children's Network

By:  Alicia Campbell

Date of Interview:  September 16, 2019

* * * *.

Interviewer: * * * *. So why is your one dad in jail? [Highlighted then redacted by trial court.]

Doe: Because he hurt my mommy bad, and he hurt me. And there's something else. Do you want me to say it out loud? [Highlighted then redacted by trial court.]

Interviewer:  Sure.   [Highlighted then redacted by trial court.]

Doe: Uh, do the cameras hear everything?

Interviewer: Uh-huh. (Nods head yes.

Doe: (Whispers) My dad stuck his penis in my mouth.

Interviewer: Your dad stuck his penis in your mouth?

Doe: (Nods head yes.)

Interviewer: Okay. Did that happen one time or was it more than one time?

Doe: Another time—every day when I get off school when mommy leaves.

Interviewer: Okay. It happened every day when you got off school?

Doe: When mommy leaves.

Interviewer: Okay. How old were you the first time that happened?

Doe: Five.

Interviewer: Five. How old--

Doe: I think. I think I was three. I don't know.

* * * *.

Interviewer: So the first time that this happened with your dad--

Doe: Yeah.

Interviewer: Where did it happen at?

Doe: Home. Home.

Interviewer: Is--

Doe: We just moved because we got in a shelter—we—and then we just get here. What comes after green? [Highlighted then redacted by trial court.]

Interviewer: * * * *. Um so what home did that happen at?

Doe: My old home.

Interviewer: Your old home?

Doe: Uh-huh.

Interviewer: Okay. What city was that in?

Doe: Canton.

Interviewer: Canton. Okay. So tell me about the first time this happened with your dad.

Doe: Um he called me by name and did it. And then he put a hat over my head. It was black.

Interviewer: Okay.

Doe: Done.

Interviewer: Where did he call you into?

Doe: His room.

* * * *.

Interviewer: So was anybody else in his room whenever he called you in there?

Doe: No.

Interviewer: No. Where was he at when you went in there?

Doe: He was on the bed and did it.

Interviewer: Did he have clothes on or were they off or something else?

Doe: His clothes were on.

Interviewer: On. And he was on the bed?

Doe: Yeah.

Interviewer: Was he sitting or was he sta—or laying or something else?

Doe: Sitting.

Interviewer: Sitting.

Doe: But I sat in a really, really small chair.

Interviewer: You sat in a really, really small chair?

Doe: Uh-huh.

Interviewer: Where at?

Doe: Uh, in his room.

Interviewer: Okay, so he was sitting on the bed. Where was your really small chair at?

Doe: Uh on the bed.

Interviewer: On the bed. Okay. And then did you have clothes on or were they off or something else?

Doe: My clothes were on.

Interviewer: Okay. So um what is a penis used for?

Doe: Going peeing and pooping.

Interviewer:  Going peeing and pooping.  Okay.  And you said that he put a black hat on you?

Doe: Uh-huh.

Interviewer:  What kind of hat was it?

Doe: Um it had letters on it.

Interviewer:  What letters?

Doe: Um I don't remember.

Interviewer:  Okay.  So was it like a baseball hat, was it a winter hat or something else?

Doe: No, it was a black, black hat--

Interviewer:  Black--

Doe: With, with a white dark, dark white um letters.

Interviewer:  Okay and um you said he had clothes on?

Doe: Uh-huh.

Interviewer:  So tell me more about how his penis went into your mouth if he had clothes on.

Doe: He took them off when I, when he put the hat on me.

Interviewer:  Okay.  Did he say anything to you when that happened?

Doe: No.

Interviewer:  Did you say anything to him?

Doe: No.  He said "Want some candy?"—put the hat over me, and then at the end he gave me a Popsicle to make my throat better.

Interviewer:  To make your throat better?

Doe: Uh-huh.

Interviewer:  So he said, "Do you want some candy," then he put the hat on and then put his penis in your mouth?

Doe: (Nods head yes.)

Interviewer:  Okay.

Doe: It happened when mommy was at the store.  Mommy's not here, bla, yada.

Interviewer:  Where were your sister and your brother? [Highlighted then redacted by trial court.]

* * * *.

Interviewer:  * * * *.  So did you see your dad's penis?

Doe: No.  Like I said he put a hat over me.

Interviewer:  A hat over you?

Doe: Uh-huh.

Interviewer:  So what was the hat covering?

Doe: My whole face.

Interviewer:  Oh your whole face.  Okay.

Doe: Blue…

Interviewer:  How do you know that it was his penis that went inside your mouth?

Doe: It was long.  Popsicles are not long; candy is not long.

Interviewer: Okay. Was anything on his penis when that happened?

Doe: No.

Interviewer: Okay. Did anything come out of his penis?

Doe: No.

Interviewer: No.

Doe: But a little drop of—(whispers) you know pee.

Interviewer: A little drop of pee?

Doe: (Nods head yes.)

Interviewer: Okay.

Doe: And I coughed.

Interviewer: And you coughed?

Doe: Uh-huh. I did not know what that was. I thought it was juice he just put in my mouth.

Interviewer: You didn't know that juice was going in your mouth?

Doe: I knew—I thought it was juice, but it tasted like bleck. * * * *.

* * * *.

Interviewer: * * * *. So after this was done with dad you said he gave you a popsicle?

Doe: Uh-huh.

Interviewer: To make your throat feel better?

Doe: Uh-huh.

Interviewer:  What was going on with your throat?

Doe: Uh, my throat was hurting a little.

Interviewer:  What made it hurt?

Doe: Uh, it hurt from um the, the stuff in my mouth.  It hurt.

Interviewer:  What stuff in your mouth?

Doe: The pee.

Interviewer:  Oh the pee.  Okay. Um what kind of popsicle did you get?

Doe: Uh blue, red, purple, pink, blue even.  We have the regular kind.  Yeah that kind.

Interviewer:  Okay.  After um, after that and you got the popsicle, what did dad do?

Doe: Well he did it again.

Interviewer:  The same day or a different day?

Doe: The same day.

Interviewer:  Same day.  Okay.

Doe:  Every time when mom says, "I'm leaving to go do stuff. I'm leaving to go do stuff."

Interviewer:  Okay.  So we talked about it happening in his bedroom; did it ever happen anywhere else?

Doe:  No.

* * * *.

Interviewer: So in here, I talk to kids about um your private parts to make sure that your private parts are safe. So how many private parts do you have on your body? [Highlighted then redacted by trial court.]

Doe: Oh 2. [Highlighted then redacted by trial court.]

Interviewer: What are the names of them? [Highlighted then redacted by trial court.]

Doe: Well, vagina, vulva, and butt. [Highlighted then redacted by trial court.]

Interviewer: Okay. So what is a butt used for? [Highlighted then redacted by trial court.]

Doe: Uh like poop. [Highlighted then redacted by trial court.]

Interviewer: And what is a vagina used for? [Highlighted then redacted by trial court.]

Doe: Like pee. [Highlighted then redacted by trial court.]

Interviewer: And what is a vulva used for? [Highlighted then redacted by trial court.]

Doe: That's a really simple question. [Highlighted then redacted by trial court.]

Interviewer: What's the answer? [Highlighted then redacted by trial court.]

Doe: I do not know. [Highlighted then redacted by trial court.]

Interviewer: Where is a vulva at on your body? [Highlighted then redacted by trial court.]

Doe: Uh, uh do not know. [Highlighted then redacted by trial court.]

Interviewer: Okay. Has anyone ever touched or hurt your butt? [Highlighted then redacted by trial court.]

Doe: Nope. [Highlighted then redacted by trial court.]

Interviewer: Has anyone ever touched or hurt your vagina? [Highlighted then redacted by trial court.]

Doe: No. [Highlighted then redacted by trial court.]

Interviewer: Has anyone ever touched or hurt your vulva? [Highlighted then redacted by trial court.]

Doe: No. [Highlighted then redacted by trial court.]

*Interviewer: Okay.*

*Doe: I try not to yell. Evelyn…All my sisters say simpler questions and sounds like it's my sisters.*

*Interviewer: Oh.*

*Doe: And I keep her—hearing really, really weird noises that people don't want me that, that say "[Jane]."*

*Interviewer: You hear those voices?*

*Doe: Uh-huh.*

*Interviewer: Where are the voices coming from?*

*Doe: I don't know. Everyone calls me for anything, and like this is creepy. Super, super creepy.*

*Interviewer: Have you told anybody about that?*

*Doe: Yeah.*

*Interviewer: Who have you told?*

*Doe: No one.*

*Interviewer: No one. Okay.*

*Doe: How do you make these?*

*Interviewer: Un just kind of make little lines. Want to copy it?*

*Doe: Mm yeah.*

Interviewer: So have you ever had to touch your dad's penis with anything other than your mouth?

Doe: No.

Interviewer: No.

Doe: Woosh. Okay.

Interviewer: Did you ever tell anyone about what was happening?

Doe: I did but they…No I didn't. Maybe at my cousin's party.

Interviewer: At your cousin's party?

Doe: Uh-huh.

Interviewer: Who did you tell?

Doe: Um my uncle.

Interviewer: What's his name?

Doe:  (inaudible)

Interviewer:  You what?

Doe:  I forget.

Interviewer:  Oh you forget?  Okay.  And what was going on you decided to tell your uncle?

Doe:  I just told him and he, he's like, "You're lying."  I said, no I'm not.

Interviewer:  Okay.  Have you and your dad ever talked about what was happening?

Doe:  No.

Interviewer:  Did you ever see dad do that to anyone else? [Highlighted then redacted by trial court.]

Doe:  No.  He didn't do it at—when my mommy got pregnant. [Highlighted then redacted by trial court.]

Interviewer:  He didn't do it when mommy got pregnant? [Highlighted then redacted by trial court.]

Doe:  No.  [Highlighted then redacted by trial court.]

Interviewer:  Okay.  Well tell me about the last time when it happened with your dad.

Doe:  The last time?

Interviewer:  Yep.

Doe:  Uh he did it when I stopped going to school.  That's when he got in jail.  Yesterday he—Well not yesterday.  I forget when

he goes to jail.  [Underlined portion highlighted then redacted by trial court.]

Interviewer:  So it stopped happening when he went to jail?  [Highlighted then redacted by trial court.]

Doe:  Uh-huh.  [Highlighted then redacted by trial court.]

* * * *.

Interviewer:  So the question I have right now: Has something like this ever happened to you with anybody other than your dad?

Doe:  No it only happened with daddy.

* * * *.

*Doe:  Okay.  Oh and there's one more thing.  My dad told me to hurt our little puppy, and now he moved.*

*Interviewer:  Who moved?*

*Doe:  Our puppy.*

*Interviewer:  Okay.*

*Doe:  And now we got a new dog.*

*Interviewer:  What did your dad tell you to do--*

*Doe:  We have like, um, we have, we have a dog named Wiggles, and a little puppy named Pepperjack.*

*Interviewer:  Okay.  What did dad tell you to do to your dog?*

*Doe:  Uh he said to go grab a um stuffed animal and I did.  So I walked over and grabbed a stuffed animal and then he, and then he took the stuffed animal and then he went like this, and then he*

*told me to pick up the doggy, and then he shook him, and I'm like ummm I don't want to…*

*Interviewer: Did you do that?*

*Doe: Yeah he told me to. He cried.*

*Interviewer: Who cried?*

*Doe: The puppy. He had, he told me to be mean mouth so I did.*

*Interviewer: And now the dog is somewhere else?*

*Doe: Uh-huh.*

*Interviewer: Okay.*

*Doe: Because of him. I was going to say, "Can we keep the dog?" and they, they said, "You have to leave and no one steps on him." He's tiny. He's like this small.*

*Interviewer: Oh yeah?*

*Doe: He's a puppy.*

*Interviewer: Okay.*

*Doe: Her mom is not here.*

*Interviewer: Did anybody know that you had to do that to your puppy?*

*Doe: No one. No one.*

*Interviewer: No one. Okay. All right. Well thanks for talking with me today. * * * *.*

*        * * * *.*

*Physical exam and diagnosis: evaluation consistent with child sexual abuse*

{¶14} After the forensic interview concluded, Edgein performed a physical examination of Doe, age 6 at the time. Edgein testified a child's age is key to the questions she asks and descriptions she expects to receive. She asked Doe about any health problems she was experiencing, and Doe described dysuria (burning during urination) and bed-wetting. The bed-wetting behavior began at age 4, which was noted by Edgein because regression in childhood developmental milestones can be an indicator of abuse. The exam revealed "no concerning physical findings;" in other words, the exam revealed no physical evidence of childhood sexual abuse. Edgein testified she was not surprised by the findings and based upon the allegation of oral sexual abuse, she would not have expected to find evidence of genital trauma.

{¶15} Ultimately Edgein diagnosed the evaluation of Doe as consistent with child sexual abuse. The alternative diagnoses would be that the evaluation is indeterminate or inconclusive, which requires further investigation to make a diagnosis, or the evaluation is not consistent with sexual abuse. Doe's diagnosis is based upon the forensic interview and the physical exam, even though there were no physical findings. The primary basis of Edgein's diagnosis was Doe's statements in the forensic interview. Edgein cited the circumstances surrounding the abuse in which appellant called Doe into his bedroom, placed her in a "little chair," and put a hat over her face; Doe's description of appellant placing his penis in her mouth; Doe's description of tasting "pee" or "juice," something "gross" in her mouth; and Doe's statement that her throat hurt afterward and appellant gave her a popsicle. Edgein noted it was important that Doe provided clear, consistent detail surrounding the incident.

{¶16} Edgein's recommendations for further treatment included testing for sexually-transmitted diseases; the test results were negative.

{¶17} Upon cross examination, Edgein said she did not question Doe about the allegations herself, instead relying upon the forensic interview. Edgein said she was unaware of some inconsistencies in details of the incident in Doe's retellings.

{¶18} Defense trial counsel asked Edgein whether she asked Doe about hearing "creepy voices." Appellee objected that this portion of the interview was not included in that deemed admissible by the trial court. The trial court sustained the objection and told counsel that if the information was not in the highlighted portion of the transcript, they should not raise it. Upon receiving this ruling by the trial court, defense trial counsel was asked whether they would like to put anything on the record, and counsel replied "Not at this time." T. I., 46-47.

{¶19} Defense trial counsel asked whether Edgein examined Doe's throat, and the nurse responded it was normal. Edgein testified Doe was appropriate for her age and her responses and attention span were typical. When asked whether she was surprised to find Doe's hymen was "normal," Edgein testified it is a misconception that there is any sign of vaginal trauma in most cases of sexual abuse; even in cases of alleged penetration, the vagina and hymen are usually "normal" because the tissue heals quickly.

{¶20} Moreover, as Edgein pointed out, Doe alleged oral sexual abuse. Edgein testified she was perfectly comfortable making the diagnosis of child sexual abuse based primarily upon Doe's statements. When asked whether anything in Doe's interview gave her cause for concern, Edgein said no. Counsel cited the example of the "small chair on the bed" and Edgein said this detail was possible, she didn't personally see the scene.

*Testimony of Jane Doe*

{¶21} Doe was questioned by the trial court at the competency hearing and found competent. Doe was age 7 at the time; the trial court found she knows the difference between the truth and a lie, and is capable of telling the truth. Doe testified she doesn't know the meaning of the phrase "staying with the angels."[3]

{¶22} The trial court found Doe did not appear to be suffering from hallucinations and was competent to testify. Prior to trial, appellee moved to exclude any evidence of Doe hearing voices. Appellant objected and stated Doe hears voices calling her name, which is similar her allegation that appellant called her name to bring her into the bedroom before the alleged abuse. T. I., 9. Defense trial counsel argued as follows:

> * * * *.
>
> So she's hearing voices saying her name at the actual interview, during the incident she says she hears someone saying her name. Also during the incident she says that she hears the words said to her something like "Do you want some candy?"
>
> So with her hearing voices, we don't know if that's actually true, but it goes to her credibility as a witness, her competency.
>
> T. I., 9.

{¶23} Pretrial, the trial court ruled that Doe would be voir dired prior to testifying, and that the parties should not mention "hearing voices" in opening statement. Defense

---

[3] This statement was another example cited by appellant as indicating issues with Doe's mental state, and the source is briefly discussed infra.

trial counsel stated that Doe told family members in the past that she talks to angels and hears their voices; the source of this allegation is Paternal Grandmother.  T. I., 10.

{¶24} The trial court determined Doe would be questioned about these matters outside the presence of the jury, before her testimony, to determine any relevance.

{¶25} During trial, Doe was briefly voir dired by the trial court out of the presence of the jury. She testified that no one told her what to say; her mother talked to her about attending court and told her to be brave and tell the truth. The trial court asked whether "any voices" told her what to say and she said no. She was also asked whether she talked to angels and she said no.  She brought a stuffed animal to court with her that her mother bought for her the day before. The trial court ruled there was no evidence to support an inference that Doe was "hearing voices" or suffering from hallucinations, and therefore granted appellee's motion in limine to exclude allegations of hallucinations.

{¶26} Doe testified she would soon be turning 8 and was presently attending online school because of Covid. She lives with mommy and her new daddy. She promised to tell the truth and testified she understands the difference between the truth and a lie.

{¶27} When asked what she told her uncle, Doe replied that she "didn't want to say in front of everyone."  She told T.J. because she felt like telling him was safe; she told him that appellant put his penis in her mouth. Appellant used to be married to her mom. Doe testified that the abuse happened more than once, and it always occurred in appellant's bedroom.

{¶28} The first incident occurred when her mom took their dog Pepperjack to the vet.  Doe was in the dining room finishing a meal and appellant called her name from his

bedroom.  Doe went into the bedroom; appellant placed a hat on her head and sat her in a chair.  She described the hat as a stretchy winter hat with letters on it, that covered her forehead and eyes.  Appellant asked her whether she wanted candy or a popsicle.

{¶29} Doe didn't say anything; she sat in the chair on the floor and appellant sat on the bed.  The room was dark and she didn't know if appellant was clothed.  He asked if she wanted candy and placed his penis in her mouth; she could not see him as this occurred because the hat covered her eyes. When asked how she knew it was a penis in her mouth, Doe said she knows what skin tastes like. A "drop of pee" came out of the penis in her mouth, and it tasted "weird," not like water or juice.

{¶30} Upon cross examination, Doe said she has never told a lie and denied that anyone told her to tell lies about appellant. When asked how she knows what a penis looks like, Doe explained that she knows what skin tastes like because she sucks her thumb when she is scared; this was not a thumb because it was long and did not have a nail. T., I, 189. She didn't touch it with her hands. She described the chair and the hat, and said both items were discarded when they moved.

{¶31} Appellant rested without calling any witnesses.

*Indictment, trial, conviction, and sentence*

{¶32} Appellant was charged by indictment with one count of rape of a child under the age of 13 pursuant to R.C. 2907.02(A)(1)(B), a felony of the first degree. The indictment notes the victim is under the age of 10.  Appellant entered a plea of not guilty.

{¶33} Appellant filed a motion to determine the competency of the child victim. Appellee filed a motion to determine the admissibility of statements of the child victim at

the Stark County Children's Network pursuant to *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775.

{¶34} The matter proceeded to an evidentiary hearing on October 26, 2020 including the testimony of the child victim. The trial court found by Judgment Entry dated October 27, 2020, that the child is capable of expressing herself in the instant case, is capable of understanding the duty to tell the truth, is deemed competent to testify at trial, and shall be permitted to testify, subject to cross-examination.

{¶35} The trial court filed a second Judgment Entry on October 27, 2020, addressing appellee's motion pursuant to *State v. Arnold*, supra. Attached to the judgment entry is a transcript of the child victim's interview at the Stark County Children's Network; the trial court underlined portions of the transcript which it found to be non-testimonial and therefore admissible at trial.

{¶36} On June 15, 2021, appellee filed a motion in limine seeking to prevent appellant from inquiring about statements made by the child victim during her forensic interview.

{¶37} Appellee argued appellant intended to offer these statements to prove Doe suffers from auditory hallucinations and is therefore not a competent witness. Appellee argued the statements are hearsay and have no nexus to Doe's testimony regarding the sexual assault.

{¶38} Appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence. The motion was overruled.

{¶39} The jury found appellant guilty as charged and made an additional finding that Doe was under the age of 10 at the time of the offense. The trial court sentenced appellant to a term of life in prison without the possibility of parole.

Defense proffer: allegations of "hearing voices"

{¶40} After appellant was sentenced, before the proceedings concluded, defense trial counsel asked to make a proffer and the trial court agreed. The following statements were made:

* * * *.

(The following was proffered into the record by [defense trial counsel].)

[COUNSEL]: Okay. Now—all right. The defense attempted to question the child about hearing voices and seeing angels. The Court ruled that was not admissible. We believe that the testimony had gone forward. The child would have testified that she heard voices during the course of her forensic evaluation. That the voices was calling her name over and over again. And it was super creepy.

In addition, we believe, that she would testify that she could talk to angels. Further, we would indicate that there is a nexus between the child hearing her name called in the interview and the incident in question, because she stated that prior to the incident that happened. Her name was called. Thank you.

THE COURT: Just so the record is covered, again. The Court chose the option of doing an in-camera interview of the child. There

was a couple of sentences on the interview. The 6-year-old child did testify, appeared to be the most articulate 6 year old I ever saw in my entire life.

The Court did question her, regarding the angels and hallucination. And it didn't seem to be the case.

And also there are no medical records or no testimony throughout the case. She had been receiving any counseling, any medical treatment or anything like that, we believe, led the Court to believe that—that had taken place. It was a forensic interview with a child, I believe, shortly after the incident. And so, we covered all that on the record.

* * * *.

T. Sentencing, 19-20.

{¶41} Appellant now appeals from the trial court's judgment entry of conviction and sentence filed June 29, 2021.

{¶42} Appellant raises six assignments of error:

## ASSIGNMENTS OF ERROR

{¶43} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST THE APPELLANT, AND THE CONVICTION MUST BE REVERSED."

{¶44} "II. THE APPELLANT'S CONVICTION WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED."

{¶45} "III. THE TRIAL COURT ERRED BY FINDING A.M., A CHILD UNDER THE AGE OF TEN, WAS COMPETENT TO TESTIFY."

{¶46} "IV. THE TRIAL COURT ERRED BY SENTENCING THE DEFENDANT TO LIFE WITHOUT THE POSSIBILITY OF PAROLE AS IT WAS CONTRARY TO LAW AND NOT SUPPORTED BY THE RECORD."

{¶47} "V. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

{¶48} "VI. THE TRIAL COURT ERRED WHEN IT GRANTED THE MOTION IN LIMINE FILED BY APPELLEE AS IT DEPRIVED APPELLANT OF A FAIR TRIAL BY PREVENTING APPELLANT FROM BEING ABLE TO QUESTION ANY WITNESS ON CROSS-EXAMINATION ABOUT THE UNUSUAL THINGS THE ALLEGED VICTIM STATED DURING HER FORENSIC INTERVIEW THAT INCLUDED HEARING WEIRD VOICES, AND ALSO BY NOT EXCLUDING THE TESTIMONY OF ALISSA EDGEIN."

## ANALYSIS

### I., II.

{¶49} Appellant's first and second assignments of error are related and will be considered together. Appellant asserts his rape conviction is not supported by sufficient evidence and is against the weight of the evidence.  We disagree.

{¶50} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus.  The standard of review

for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶51} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶52} Appellant was found guilty upon one count of rape of a child under the age of 13 pursuant to R.C. 2907.02(A)(1)(B)(b), which states in pertinent part:

> (A)(1) No person shall engage in sexual conduct with another
>
> * * * when any of the following applies:
>
> * * * *.

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

* * * *.

(B) Whoever violates this section is guilty of rape, a felony of the first degree. * * * *.  Except as otherwise provided in this division, notwithstanding sections 2929.11 to 2929.14 of the Revised Code, an offender under division (A)(1)(b) of this section shall be sentenced to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code. * * * *. If an offender under division (A)(1)(b) of this section previously has been convicted of or pleaded guilty to violating division (A)(1)(b) of this section or to violating an existing or former law of this state, another state, or the United States that is substantially similar to division (A)(1)(b) of this section, if the offender during or immediately after the commission of the offense caused serious physical harm to the victim, or **if the victim under division (A)(1)(b) of this section is less than ten years of age, in lieu of sentencing the offender to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code, except as otherwise provided in this division, the court may impose upon the offender a term of life without parole**. If the court imposes a term of life without parole pursuant to this division, division (F) of section 2971.03 of the Revised Code applies, and the

offender automatically is classified a tier III sex offender/child-victim

offender, as described in that division. \* \* \* \*.  (Emphasis added).

{¶53} "Sexual conduct" includes fellatio.  R.C. 2907.01(A).

{¶54} In the instant case, Jane Doe testified that appellant placed his penis in her mouth when she was 6 years old. She later disclosed the abuse to her uncle and an investigation ensued.

{¶55} Appellant argues his conviction is against the manifest weight of the evidence because it is premised upon Doe's word alone, absent any physical evidence. The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Nash*, 5th Dist. Stark No. 2014CA00159, 2015-Ohio-3361, ¶ 20, citing *State v. Cunningham,* 105 Ohio St.3d 197, 2004–Ohio–7007, 824 N .E.2d 504, at ¶ 51–57. We are mindful, moreover, that "[c]orroboration of victim testimony in rape cases is not required." *State v. Meeks*, 5th Dist. Stark No. 2014CA00017, 2015-Ohio-1527, 34 N.E.3d 382, ¶ 81, appeal not allowed, 143 Ohio St.3d 1543, 2015-Ohio-4633, 40 N.E.3d 1180, citing *State v. Cuthbert,* 5th Dist. Delaware No. 11CAA070065, 2012-Ohio-4472, 2012 WL 4474720, ¶ 28 and *State v. Johnson,* 112 Ohio St.3d 210–217, 2006-Ohio-6404, 858 N.E.2d 1144, at ¶ 53.

{¶56} Appellant also points to minor inconsistencies in Doe's account.  While the jury may take note of inconsistencies and resolve or discount them accordingly, such inconsistencies alone do not render a conviction against the manifest weight or sufficiency of the evidence*. State v. Wolters*, 5th Dist. No. 21CA000008, 2022-Ohio-538, 185 N.E.3d 601, ¶ 20, citing *State v. Craig*, 10th Dist. Franklin App. No. 99AP-739, 2000 WL 297252, (Mar. 23, 2000) \*3, internal citation omitted.

{¶57} In a case involving inconsistencies in the testimony of a seven-year-old child victim, this Court noted, "The jury was free to use their life experiences in assessing the testimony of a child verses an adult and draw its conclusion." *Wolters, supra,* at ¶ 20, citing *State v. Allen,* 5th Dist. Stark No. 2021CA00051, 2022-Ohio-268, 2022 WL 278398, ¶ 31. We therefore find inconsistencies in the five-year-old child victim's statements regarding the sexual conduct does not render the judgment against the manifest weight or sufficiency of the evidence. *Id.*

{¶58} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 189, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Doe's testimony, if believed, supports a conviction for a charge of rape in violation of R.C. 2907.02(A)(2). *State v. Singleton*, 5th Dist. Delaware No. 20 CAA 06 0026, 2021-Ohio-3010, ¶ 32, appeal dismissed*,* 165 Ohio St.3d 1508, 2022-Ohio-140, 179 N.E.3d 1267.

{¶59} Upon review, we decline to second-guess the credibility determinations of the jury in this matter.  See, *Schmelmer*, supra.  This is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.

{¶60} The trial court neither lost its way nor created a miscarriage of justice in convicting appellant of rape, and appellee presented evidence of his guilt beyond a reasonable doubt.

{¶61} Appellant's first and second assignments of error are overruled.

III.

{¶62} In his third assignment of error, appellant argues the trial court erred in finding Jane Doe competent to testify. We disagree.

{¶63} Every person is competent to be a witness except those of unsound mind, and children under ten years of age who appear incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly. Evid.R. 601(A).

{¶64} In determining whether a child under the age of ten is competent to testify, the trial court must consider: (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity, and (5) the child's appreciation of his or her responsibility to be truthful. *State v. Wolters*, 5th Dist. No. 21CA000008, 2022-Ohio-538, 185 N.E.3d 601, ¶ 30, citing *State v. Frazier,* 61 Ohio St.3d 247, 574 N.E.2d 483 (1991). To reverse a finding of competency, we must find the trial court abused its discretion. *State v. Lewis*, 4 Ohio App.3d 275, 448 N.E.2d 487 (3rd Dist. 1982).

{¶65} As noted supra, we have reviewed the record of the competency/*Arnold* hearing. We find the child victim demonstrated an ability to receive accurate impressions of fact, was able to recollect impressions or observations, could communicate what was observed, understood truth and falsity, and appreciated her responsibility to be truthful. *Wolters*, supra, 2022-Ohio-538, ¶ 31. The trial court did not abuse its discretion in finding her competent to testify.

{¶66} Appellant further argues her inconsistent and contradictory testimony at trial demonstrates she was not competent to testify. In *Wolters*, supra, 2022-Ohio-538, at ¶

33, we favorably cited the decision of the Twelfth District in *State v. Jones*, 12th Dist. Brown No. CA2000-11-032, 2001 WL 1402638 at *6, in which the Court addressed the issue at stake in a determination of the competence of a child witness:

> [I]t is not the role of the trial judge to determine that everything a child will testify to is accurate, but whether the child has the intellectual capacity to accurately and truthfully recount events. *State v. Leach* (Feb. 20, 2001), Clermont CA2000-05-033, unreported, at 5 [2001 WL 171026]. Any inconsistencies between [a child's] trial testimony and the testimony of other witnesses relate to [the child's] credibility, not [their] competency. See *id.; State v. Rayburn* (Apr. 24, 2000), Clinton CA99-03-005, unreported, at 6 [2000 WL 485501]. [The child's] credibility was for the jury's consideration.

{¶67} Akin to our analysis in *Wolters*, we find any inconsistencies and contradictions in Doe's testimony went to her credibility, not to her competency.

{¶68} Appellant's third assignment of error is overruled.

IV.

{¶69} In his fourth assignment of error, appellant argues the trial court erred in sentencing to a prison term of life without the possibility of parole. We disagree.

{¶70} Appellant was convicted of the rape of a child under the age of 10. R.C. 2907.02(B) states in relevant part:

> [I]f the victim under division (A)(1)(b) of this section is less than ten years of age, in lieu of sentencing the offender to a prison term or term of life imprisonment pursuant to section 2971.03 of the

Revised Code, the court may impose upon the offender a term of life without parole. If the court imposes a term of life without parole, pursuant to this division, division (F) of section 2971.03 of the Revised Code applies, and the offender automatically is classified a tier III sex offender/child victim offender, as described in that division.

{¶71} In accordance with R.C. 2907.02(B), R.C. 2971.03(B)(1)(b) provides in relevant part:

[I]f a person is convicted of or pleads guilty to a violation of division (A)(1)(b) of section 2907.02 of the Revised Code committed on or after January 2, 2007, if division (A)1 of this section does not apply regarding the person, and if the court does not impose a sentence of life without parole when authorized pursuant to division (B) of section 2907.02 of the Revised Code, the court shall impose upon the person an indefinite prison term consisting of one of the following:

(b) If the victim was less than ten years of age, a minimum term of fifteen years and a maximum of life imprisonment.

{¶72} Appellant makes several arguments under this assignment of error. First, he accuses the trial court of improperly weighing the principals and purposes of felony sentencing contained in R.C. 2929.11 and the seriousness and recidivism factors contained in R.C. 2929.12 when it imposed a sentence of life without the possibility of parole. We disagree.

{¶73} This court reviews felony sentences using the standard of review set forth in R.C. 2953.08. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22; *State v. Howell*, 5th Dist. Stark No. 2015CA00004, 2015-Ohio-4049, ¶ 31. Subsection (G)(2) sets forth this court's standard of review as follows:

(2) The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶74} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required beyond a reasonable doubt' in criminal cases, and which will produce in

the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶75} "A sentence is not clearly and convincingly contrary to law where the trial court 'considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes post release control, and sentences the defendant within the permissible statutory range' " *State v. Morris*, 5th Dist. Ashland No. 20-COA-015, 2021-Ohio-2646, ¶ 90, quoting *State v. Dinka*, 12th Dist. Warren Nos. CA2019-03-022 and CA2019-03-026, 2019-Ohio-4209, ¶ 36.

{¶76} There is no dispute that a sentence of life without the possibility of parole is within the statutory range for a first-degree felony rape of a child under the age of 10. Appellant instead argues the trial court failed to properly consider the principles and purposes of felony sentencing under R.C. 2929.11 and the seriousness and recidivism factors under R.C. 2929.12.

{¶77} R.C. 2929.11 governs the overriding purposes of felony sentencing and states the following in pertinent part:

> (A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local

government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(B) A sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

{¶78} R.C. 2929.12 governs factors to consider in felony sentencing and states the following in pertinent part:

(A) Unless otherwise required by section 2929.13 or 2929.14 of the Revised Code, a court that imposes a sentence under this chapter upon an offender for a felony has discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code. In exercising that discretion, the court shall consider the factors set forth in divisions (B) and (C) of this section relating to the seriousness of the conduct, the factors provided in divisions (D) and (E) of this section relating to the likelihood of the offender's recidivism, and the factors set forth in division (F) of this section pertaining to the

offender's service in the armed forces of the United States and, in addition, may consider any other factors that are relevant to achieving those purposes and principles of sentencing.

{¶79} R.C. 2929.11 does not require the trial court to make any specific findings as to the purposes and principles of sentencing. Likewise, R.C. 2929.12 does not require the trial court to "use specific language or make specific findings on the record in order to evince the requisite consideration of the applicable seriousness and recidivism factors." *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). Therefore, although there is a mandatory duty to "consider" the relevant statutory factors under R.C. 2929.11 and 2929.12, the sentencing court is not required to engage in any factual findings under said statutes. *State v. Bement*, 8th Dist. Cuyahoga No. 99914, 2013-Ohio-5437, ¶ 17; *State v. Combs*, 8th Dist. Cuyahoga No. 99852, 2014-Ohio-497, ¶ 52. "The trial court has no obligation to state reasons to support its findings, nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *State v. Webb*, 5th Dist. Muskingum No. CT2018-0069, 2019-Ohio-4195, ¶ 19.

{¶80} Moreover, as recently stated by the Supreme Court of Ohio in *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 39, R.C. 2953.08(G)(2)(b) "does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." "Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the

trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12" *Id.* at 4

{¶81} In the instant case, the trial court indicated during the sentencing hearing and in its judgment entry that it had considered R.C. 2929.11 and R.C. 2929.12 in fashioning appellant's sentence. The trial court noted appellant had a prior conviction for kidnapping, and in the instant case, traumatized a six-year-old child, taking advantage of his relationship to the child as a stepfather. Upon review, we find the trial court properly weighed the appropriate considerations under R.C. 2929.11 and R.C. 2929.12. *State v. Allen*, 5th Dist. Stark No. 2021CA00051, 2022-Ohio-268, ¶ 56.

{¶82} Appellant next argues his sentence is not consistent with that of other individuals sentenced for the same offense, citing two cases in the Stark County Court of Common Pleas in  which offenders convicted of rape of a child under the age of 10 were sentenced to prison terms of 20 years and 6 years, respectively. In *State v. Ryan,* 1st Dist. Hamilton No. C-020283, 2003-Ohio-1188, ¶ 10, our colleagues from the First District explained the following:

> The Ohio plan attempts to assure proportionality in felony sentencing through consistency. R.C. 2929.11(B). Consistency, however, does not necessarily mean uniformity. Instead, consistency aims at similar sentences. Accordingly, consistency accepts divergence within a range of sentences and takes into consideration the trial court's discretion to weigh relevant statutory factors. *Id.* [Griffin and Katz, Sentencing Consistency: Basic Principles Instead of Numerical Grids: The Ohio Plan (2002), 53 Case W.R.L.Rev. 1,

12] at 12. The task of the appellate court is to examine the available data not to determine if the trial court has imposed a sentence that is in lockstep with others, but whether the sentence is so unusual as to be outside the mainstream of local judicial practice. *Id.* at 13. Although offenses may be similar, distinguishing factors may justify dissimilar sentences. *Id.* at 15.

{¶83} *Accord State v. King,* 5th Dist. Muskingum No. CT06-0020, 2006-Ohio-6566.

{¶84} We have reviewed the record and do not find the sentence imposed "is so unusual as to be outside the mainstream of local judicial practice." *State v. Harris*, 5th Dist. Muskingum No. CT2020-0052, 2021-Ohio-4007, ¶ 53, *appeal not allowed,* 165 Ohio St.3d 1542, 2022-Ohio-397, 180 N.E.3d 1177. The trial court heard the evidence, considered the necessary factors, and imposed a sentence within the guidelines. We do not find anything in the record to declare the sentence to be a disproportionate sentence. Moreover, if appellant believed his sentence was disproportionate to the others imposed for similar offenses, he was obligated to raise the issue with the trial court and present some evidence in order to preserve the matter for appeal. *State v. Allen*, 5th Dist. Stark No. 2021CA00051, 2022-Ohio-268, ¶ 57, citing *State v. Ewert*, 5th Dist. Muskingum No. CT2012-0002, 2012-Ohio-2671 ¶ 32.

{¶85} Finally, appellant argues the trial court gave too much weight to appellant's prior conviction of kidnapping. It is well settled, however, that a trial court may consider a defendant's historical behavior during sentencing. *Allen*, supra, 2022-Ohio-268, ¶ 58. "A

sentencing court has wide discretion in considering factors necessary to craft a sentence[.]" *State v. Keslar*, 8th Dist. Cuyahoga No. 107088, 2019-Ohio-2322, ¶ 12.

{¶86} Based on the record before this court, we find the trial court's findings in support of its imposition of life without the possibility of parole are supported by the record.

{¶87} The fourth assignment of error is overruled.

V., VI.

{¶88} Appellant's fifth and sixth assignments of error are related and will be considered together. He argues the trial court improperly allowed appellee's expert witness to opine as to Doe's veracity, and that he received ineffective assistance of defense trial counsel because there was no objection or motion for mistrial. Finally, appellant argues the trial court erred in granting appellee's motion in limine regarding the evidence of Doe "hearing voices." We disagree.

{¶89} Appellant argues the trial court committed reversible error by allowing appellee's expert, Alissa Edgein, to testify to her diagnosis of Doe's evaluation as consistent with child sexual abuse, because the diagnosis was based upon Doe's statements alone in the absence of physical evidence.

{¶90} Determinations regarding the admissibility of expert testimony are generally within the discretion of the trial court and, absent an abuse of that discretion, will not be overturned. *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 616, 687 N.E.2d 735. The Ohio Supreme Court discussed the issue of expert testimony in child sexual abuse cases in *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), overruled, in part, on other grounds by *State v. Muttart,* 116 Ohio St.3d 5, 2007–Ohio–5267, 875 N.E.2d 944. The Supreme Court held that "the use of expert testimony is perfectly proper [in cases

involving alleged child abuse] and such experts are not limited to just persons with scientific or technical knowledge but also include other persons with 'specialized knowledge' gained through experience, training or education." *Id.* at 126. "[A]n expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible pursuant to Evid.R. 702 and 704." *Id.* at 128. However, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Id.* at syllabus.

{¶91} As an example of expert testimony impermissibly bolstering a witness' credibility, the expert in *Boston* testified "that [the victim] had not fantasized her abuse and that [the victim] had not been programmed to make accusations against her father." *Id.* at 128. The Supreme Court found this testimony "egregious" and "prejudicial," since it, "in effect, declared that [the victim] was truthful in her statements." *Id.*

{¶92} In a later decision, the Ohio Supreme Court affirmed its position that "[i]t *is* permissible * * * for an expert to convey this belief[, i.e., that the child was actually abused,] to the jury." *State v. Stowers,* 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (emphasis sic). In *Stowers,* the Court recognized a distinction "between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused." *Id.* at 262, 690 N.E.2d 881 (emphasis sic). While the former is the sort of testimony prohibited by *Boston,* the other sort, "which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity," does not violate this prohibition. *Id.* at 262–263 (emphasis sic).

{¶93} In practice, the decision of whether to allow an expert to offer an opinion on the issue of whether abuse has occurred often turns on the foundation of the expert's opinion. *State v. Britta*, 11th Dist. Lake No. 2009-L-017, 2010-Ohio-971, ¶ 69. While there must not always be "physical evidence present before an expert can render a valid opinion on whether a child has been sexually abused * * *, there simply has to be something other than the child's unsupported allegations that assisted the expert in arriving at his or her opinion." *State v. Schewirey,* 7th Dist. No. 05 MA 155, 2006–Ohio–7054, at ¶ 48 (citation omitted). "This would obviously include physical evidence, but could also involve the expert's observations of the child's demeanor or other indicators tending to show the presence of sexual abuse." *Id.*

{¶94} Thus, where the expert's opinion is based solely on the testimony of the alleged victim, courts of appeals have deemed such opinions as "tantamount to permitting the expert to testify as to the child's veracity." *State v. Britta*, supra, 11th Dist. Lake No. 2009-L-017, 2010-Ohio-971, ¶ 70, citing *Johnson,* 2008–Ohio–6657, at ¶ 32. Where the expert's opinion is "based upon all of the data he had in front of him, [and] not just the victim's statements," it does not "constitute his personal opinion as to the veracity of the victim's complaints" and is, therefore, admissible. *Id.,* citing *State v. Muhleka,* 2nd Dist. No. 19827, 2004–Ohio–1822, at ¶ 40.

{¶95} In the instant case, Edgein's testimony was based upon her education and experience in evaluating allegations of child sexual abuse. She noted the level of detail in Doe's statements about the abuse. Edgein also noted the onset of bedwetting at age 4 and dysuria as potential indicators of abuse. The absence of physical findings during

the exam was neither unusual nor unexpected given the nature of the abuse reported and the amount of time that had elapsed.

{¶96} Edgein's testimony provides an adequate foundation to admit her opinion of the evaluation as consistent with sexual abuse. Such opinion testimony was expressly sanctioned by the Ohio Supreme Court in *Stowers.* 81 Ohio St.3d at 261, 690 N.E.2d 881. The opinion is duly based upon Edgein's training and experience, her interview and physical examination of Doe, and the forensic interview at the Stark County Children's Network.

{¶97} We find that the opinion expresses Edgein's professional opinion that Doe was actually abused without directly commenting on Doe's veracity. See, *Britta*, supra, 2010-Ohio-971, ¶ 76. The fact that the opinion supports the veracity of the child victim's testimony does not render the opinion inadmissible. *Id.* Appellant's reliance on *State v. Knight,* 8th Dist No. 87737, 2006–Ohio–6437 is misplaced because that case rests on the conclusion that an expert based her diagnosis solely on her assessment of the victim's veracity. *Knight,* 2006–Ohio–6437, at ¶ 31. As noted supra, the record is replete with the basis of Edgein's diagnosis.

{¶98} Appellant further argues he received ineffective assistance of defense trial counsel because counsel failed to object or move for mistrial because Edgein "improperly testified regarding her opinion as to the veracity of Doe's statements." Brief, 24.

{¶99} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶100} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶101} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶102} In light of our finding that Edgein's opinion was not improperly admitted by the trial court, defense trial counsel did not err in failing to object on that basis.

{¶103} Finally, appellant argues the trial court erred in granting appellee's motion in limine preventing him from questioning Doe about her statements regarding "hearing voices." We begin by noting the entire discussion of Doe "hearing voices" is premised upon unfounded speculation that the child experienced auditory hallucinations. The speculation is based upon an ambiguous portion of the forensic interview in which Doe's statements, without additional context, could be interpreted a number of ways. The purely speculative nature of appellant's argument is evident in his proffer, at the end of the proceedings, after sentencing, in which he proffered no evidence in support of his

premise here: the trial court should have allowed him to "inquire about these unusual things" because further inquiry might have led to psychiatric testimony that would have impeached Doe's testimony. Brief, 27. He argues he should have been permitted to cross-examine Edgein about the "potential auditory hallucination," but Edgein was not the forensic interviewer to whom Doe made the statements. Edgein testified Doe's demeanor and attention span were normal for a child her age.

{¶104} Appellant cites no support for his proposition that the trial court should have permitted him greater latitude to explore the psyche of the child witness. In the context of the entire trial, and in the context of Doe's testimony specifically, we find his argument misplaced.

{¶105}      Appellant's fifth and sixth assignments of error are overruled.

**CONCLUSION**

{¶106}      Appellant's six assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Wise, John, J., concur.